John Russell, Administrator of Estate of William Russell, Deceased, Appellee, v. Guy A. Richardson, Receiver et al., Trading as Chicago Surface Lines, Appellants.

Gen. No. 40,714.

12

Opinion filed December 30, 1940.

FRANK L. KRIETE, CHARLES E. GREEN and ARTHUR J. DONOVAN, all of Chicago, for appellants; JOHN R. GUILLIAMS, of Chicago, of counsel.

ROYAL W. IRWIN, of Chicago, for appellee.

MR. JUSTICE JOHN J. SULLIVAN delivered the opinion of the court.

This is an action under the Injuries Act to recover pecuniary loss occasioned by the death of William Russell, alleged to have resulted from injuries sustained December 23, 1936, when he was struck by the front end of a westbound street car on the west crosswalk of the intersection of 59th and Peoria streets in Chicago. A motion for a directed verdict was made by defendants at the close of plaintiff's evidence, which was all the evidence offered or received on the trial. The ruling on said motion was reserved and the motion was taken under advisement. The case was submitted to the jury, which found defendants guilty

and assessed plaintiff's damages at $2,000. Defendants' motion that the trial court rule on their motion for a directed verdict and enter a judgment of not guilty notwithstanding the verdict was denied and judgment was entered on the verdict on January 7, 1939. This appeal followed.

The evidence disclosed that the accident occurred shortly after 7:30 in the morning. It was a little misty but it was light enough so a person could see the street car at Halsted street, which was two blocks away. 59th street is a perfectly straight street. The street car was making the usual noise made by street cars as it came from Halsted street, passed Green street and came up to Peoria street. There was no traffic of any kind on the street between the street car in question and the place of the accident and nothing to obstruct the view of the street car at any time as it approached and crossed Peoria street. At the northeast corner of 59th and Peoria streets there were no buildings. The street car was moving west at a speed of 20 to 25 miles an hour, which witnesses said was the usual speed of street cars on 59th street. When the street car was between Green and Peoria streets the motorman threw off the power and slackened the speed of the car a little but put the power on again right away. Peoria street is designated as a "stop street" for passengers to board or alight from street cars operated on 59th street. Two men were standing east of Peoria street waiting for a westbound street car. One of them said they were standing 6 or 7 feet east of the east crosswalk of Peoria street and the other said that they were standing 11 or 12 east of Peoria street.

The decedent, William Russell, was 20 years old and lived at 5709 S. Green street. Green street is one block east of Peoria street. Russell was employed as a stenographer in the traffic department of the Baltimore & Ohio Railroad Company. He was in perfect

health and his eyesight and hearing were good. He had lived in that neighborhood for some time and was well acquainted with the intersection where the accident happened. On the morning in question Russell left his home between 7:30 and a quarter to eight and was walking south on the west side of Peoria street, presumably intending to take an eastbound car on 59th street. The distance from the north curb of 59th street to the first rail of the westbound track is from 10 to 12 feet. Peoria street is about 30 feet wide.

Howard Runyan testified that he was a passenger on the westbound 59th street car that was involved in the accident; that he was standing on the front platform of the street car and had an unobstructed view of 59th street; that he was looking west and north; that Green street is one short block west of Halsted street and Peoria street is one short block west of Green street; that Green street is not a "stop street" for street cars but that Peoria street is; that when he first saw him, Russell was walking south at a fast walk on the west sidewalk of Peoria street and about 15 feet north of the north curb of 59th street; that at that time the front end of the street car was 25 or 30 feet east of Peoria street and the car was traveling at a speed of 20 to 25 miles an hour, making the usual noise; that there were two or three people standing a little east of Peoria street, waiting for the westbound street car; that there was nothing to obstruct or interfere with his view of Russell and there was nothing between Russell and the moving car; that the street car continued to move at the same rate of speed in entering Peoria street, which was the usual speed of street cars; that "the man stepped from the curb just about the time the street car was leaving the east side of Peoria street, that is, the front of the car and I didn't see him turn to look at the car at all . . . he walked right on straight across the street in a fast walk and it seemed to me that I felt the car was going to hit him

because he didn't seem to turn his head and he walked right straight across the track and just about as his foot hit the first rail the car struck him in the head''; that the ''front end of the car was just about even with the east side of Peoria street . . . still going along in about the usual speed'' when Russell reached the curbstone on the north side of 59th street; that he saw no eastbound street car; that the northeast corner of 59th and Peoria streets was a vacant lot; that the motorman applied the brakes when the street car was in the center of Peoria street as soon as he saw the man step from the curb and ''made every effort to stop the car''; that ''when Russell was three or four feet from the north rail of the westbound track the car was probably within ten or fifteen feet from him, maybe a little closer than that''; that the motorman continued to keep the brakes on until the accident occurred; that Russell never stopped or slackened his pace; that he kept right on going and ''just about as his foot hit the first rail the car struck him in the head''; that ''he was thrown about fifteen feet to the gutter and to the right of the street car, the side from which he was coming''; and that the witness did not hear the motorman ring the gong at any time.

Charles Farrell testified that he was standing on the north side of 59th street, 10 or 11 feet east of Peoria street, waiting for a westbound street car; that he did not hear the gong as the street car came along but that he could hear the usual noise that a street car makes; that ''just probably twenty-five to thirty feet before he hit the corner it seemed as though he tried to slacken up the speed a little but then he seemed to pick up speed right away again . . . I mean he tried to slack up the speed probably 20, 25 feet before he came up to where the car should stop and then when he got just a little way from where it should stop he picked up speed again''; that the street car was going just as fast when it passed him as it was when he saw it

coming toward him; that when the street car came up to within 50 feet of him, it was going along at the usual speed and when it passed him it was going along at the usual speed; that he did not see the street car strike Russell, but he heard the sound of the brakes on the car when the front end of the street car was a little past the center of Peoria street; and that when he looked toward the west, Russell "was seven or eight feet from the crosswalk and still on his feet . . . He was spinning around at that time and he made a half circle in the street and slid down and fell all the way to the curbstone."

John Polakowski testified that he was standing on the front platform of the street car just to the left of the motorman and that he was looking out the front window of the car; that from the time the street car left Halsted street and approached Peoria it was going 20 or 25 miles an hour; that when the street car was about half a block east of Peoria street the motorman "turned the lever, shut off the power . . . he danged his bell and he put the power back on . . . went right through . . . he picked up the speed where he left off"; that when he turned the power off the street car just coasted; that the speed of the street car when it was coasting was 20 to 25 miles an hour; that the car was going 20 miles an hour and it slowed to 15 miles an hour; that the motorman clanged the gong when he was about half a block east of Peoria street; that he noticed three or four people waiting for a street car between the curb and the car tracks; that they were about three feet or so north of the west-bound street car tracks and almost on the corner of Peoria street; that he noticed "the deceased fellow that got killed"; that "I seen him walking about, oh, he was two doors away from the corner . . . he kept walking . . . south . . . at a steady pace"; that "he looks toward our way when he was stepping off the curb"; that he then "crossed the street . . .

on the west crosswalk . . . walking south''; that
he did not see Russell ''look in any other direction or
turn his head in any other direction after that''; that
after the street car started to cross Peoria street, it
was going from 20 to 25 miles an hour; that the gong
was rung on the street car before it came to Peoria
street but not after; that he was watching Russell from
the time he looked when he was at the curb until he
was struck by the street car; that he saw ''the man get
hit''; that when the motorman first started to apply
the brakes ''the street car was almost on top of this
fellow . . . about four or five feet''; that Russell
was struck when he put his foot over the north rail;
that ''he tried to back out of the way''; that the ''right
hand side'' of the street car struck him; that the man's
body was knocked over to the north curb and about
25 feet west of the corner; and that after the gong
rung when the street car was 100 to 150 feet east of
Peoria, it did not ring again up to the time the decedent
was struck.

James Walsh testified that he was about 6 or 7
feet east of the east crosswalk of Peoria street, wait-
ing for a westbound car; that he was standing about
3 feet north of the north rail; that he first saw the
westbound street car which was involved in the ac-
cident when it was about Green street; that it was
going pretty fast; that when he first saw him, Russell
''was just crossing the street at 59th and Peoria, com-
ing from the north on Peoria . . . he was going
south . . . he was walking . . . he looked
around . . . he looked east before he crossed the
street''; that when he looked east Russell was ''just at
the curbstone''; that at that time the street car was
''almost at the corner of Peoria''; that after the street
car left Green street, ''it started to pick up speed and
was going pretty fast . . . in about the middle of
the block it slowed down a little''; that when the
street car slowed down ''it was quite a ways'' east of

Peoria street; that after the street car "slackened speed" it did not go very far; that "then it picked up speed . . . she started to go pretty fast again, didn't slow down much"; and that he did not hear the gong sounded or the bell rung on the street car at any time.

Walsh testified on cross-examination that when he turned around and looked toward the west the street car "was just right at the corner . . . right at the corner of Peoria"; that when he "looked to the west" and saw Russell "stepping off the curbstone," the front end of the street car was "about five feet, six feet" from the corner; and that when Russell was about half way between the north rail and the north curb of 59th street, the street car was a "little further east of the center." He also testified that "there was an eastbound car coming."

William Kenny testified that he was a passenger on the street car, that he was in the first seat on the right side of the car facing toward the west and saw decedent struck; that as the street car approached Peoria street, its maximum speed was about 25 miles an hour; that at the time of the accident its speed was about 15 miles an hour; that as the street car approached Peoria street it "slowed down a bit . . . I don't know how much"; that when it slowed down it was about 100 or 150 feet east of Peoria street; that he saw the decedent about one second before the accident; that he did not hear "the ringing of the gong on the street car" before he saw the deceased; that he did not feel any slackening of the speed of the street car before he saw the deceased; that Russell was about 6 feet away; that at that time "I just saw his head . . . I couldn't see that he did anything; just looked at the street car"; that he was looking through the right front window, the one furthest north; that the first thing that directed his attention was when he saw the man's head through the window of the car; that when

he first saw the decedent, he was about 6 feet away and the street car was west of the center of Peoria street; that it was broad daylight; and that after the accident the decedent was lying in the gutter 20 or 30 feet west of Peoria street.

Defendants contend that the evidence does not fairly and reasonably tend to prove that plaintiff's intestate was in the exercise of due care at and just before the happening of the accident; that the evidence does not fairly and reasonably tend to prove that defendants were guilty of any negligence which was a proximate cause of the accident; that the court erred in refusing to direct a verdict for defendants; and that the court erred in refusing to enter judgment for defendants notwithstanding the verdict.

Plaintiff's position is that the questions of negligence, contributory negligence and damages were clearly questions of fact and were properly submitted to the jury.

Was Russell guilty of contributory negligence as a matter of law? In considering and determining this question we must adopt the state of facts as disclosed by the evidence which is most favorable to plaintiff and, if there is any evidence in the record which reasonably tends to show that at the time of and immediately prior to the accident decedent was in the exercise of ordinary care and caution for his own safety, then the question of contributory negligence was one of fact for the jury. Just what are the facts bearing upon this question? Only two of the witnesses, Polakowski and Walsh, testified that they saw the decedent look toward the east in the direction of the approaching street car and they both stated that he looked only once. Polakowski said that the only time he saw Russell look toward the east was "when he was stepping off the curb" and Walsh stated that the only time he saw Russell look toward the east was "when he was just at the curbstone" on the north side of

59th street. Three witnesses, Runyan, Polakowski and Walsh testified as to where the street car was when Russell stepped from the north curb of 59th street onto the west crosswalk of Peoria street. Runyan, who testified that he did not see Russell look east at any time, said that the deceased stepped from the curb onto the west crosswalk of Peoria street just about the time the front end of the street car was leaving the east side of Peoria street. Polakowski stated that when Russell stepped off the curb, the front end of the street car had already passed the two men who were waiting for the street car on the east side of Peoria street; that when decedent stepped off the curb the street car was out in Peoria street, going along at the usual speed; and that at the time Russell looked east, the street car was well over the "sidewalk line" on the east side of Peoria street. Walsh testified that when Russell was at the curbstone and looked east, "the street car was almost at the corner of Peoria," and that he [Walsh] was standing 6 or 7 feet east of Peoria street and as the front end of the car passed him, he looked west and saw Russell stepping off the curbstone. One witness saw an eastbound car approaching, but he did not state how far west of Peoria street it was at the time. Some of the other witnesses stated that they saw an eastbound street car standing just west of Peoria street after the accident.

There was nothing to obstruct Russell's view of the approaching westbound street car, either before or after he stepped from the north curb onto the street or thereafter until he was struck by the car. Thus we have this situation presented. When the decedent was at the curbstone, which was the only time or place that any witness said that he looked toward the oncoming street car, it was just entering or was about to enter Peoria street and was traveling at the rate of 20 to 25 miles an hour, which was the usual speed of

street cars on that street. It was making the usual noise. Russell was then 10 or 12 feet from the first rail of the westbound track and perfectly safe. As will be hereafter shown he had no reason to believe that the street car would be stopped or could be stopped before it reached the west crosswalk of Peoria street, which street was about 30 feet wide. Yet, he did not stop but continued walking toward the track without looking again. When he was 3 or 4 feet from the track he was still perfectly safe. He was then at a point beyond which an ordinarily prudent man would not have gone until the street car had passed. It was so close to him and coming at such speed that it struck him as he put his foot on the north rail. Reasonable minds must agree that, under the facts and circumstances in evidence, he did not have a chance of crossing in front of the street car in safety. An adult person of ordinary prudence is or should be capable of judging whether there is a threat of danger from an approaching street car. While a street car track may not be a dangerous place *per se* there can be no doubt but that a street car track upon which a street car is rapidly approaching and so near at the time as to strike a person as soon as he steps upon the first rail, is at such time a dangerous place. It has long been the rule in this State that it is the duty of persons about to cross a dangerous place to approach it with care commensurate with the known danger, and when one on a public highway fails to use ordinary precaution while proceeding over a dangerous place, such conduct is by the general knowledge and experience of mankind condemned as negligence. *Dee v. City of Peru,* 343 Ill. 36. In *Myhre v. Chicago City Ry. Co.,* 216 Ill. App. 128, the court said at p. 131: "The purpose of looking, as an act of caution, is to determine what one shall safely do next; ordinarily this will be to move or to stand still; hence the looking must be

done when and where one can act safely with reference to any danger observed, otherwise the act of looking is minus the element of caution.''

Due care of plaintiff's intestate is a separate and distinct question from any claim of negligence on the part of defendants. (*Carson Pirie Scott & Co. v. Chicago. Rys. Co.*, 309 Ill. 346; *Bushman v. Calumet & South Chicago Ry. Co.*, 214 Ill. App. 435.) While Russell and defendants had equal rights at this intersection, still it was impossible for Russell and the street car to cross at the same place at the same time without colliding. (*Hedmark v. Chicago Rys. Co.*, 192 Ill. 584.) A reasonably prudent man in the same circumstances as disclosed by plaintiff's witnesses would in deference to his own personal safety forego his technical right to cross the street until it was reasonably safe to do so. A man on foot may stop almost instantly upon the appearance of danger while it requires some distance to stop a heavy street car and a reasonably cautious man should take this into consideration in the exercise of due care for his own safety. In discussing the question of reasonable care in *Lee v. Chicago City Ry. Co.*, 127 Ill. App. 510, the court used this language at pp. 512 and 513:

''It is true, as his attorney argues, that both appellant's team and the car had equal rights at this street intersection. Appellant was on the crossing first; but when by keeping his eyes open and his wits about him he could have gotten out of the way and escaped the danger with perfect ease and without trouble or risk, ordinary care for his own safety should have led him to make some effort to do so. . . . Some watchfulness, some alertness, some reasonable degree of care for his own safety are requisite, and as to this 'there is no reasonable chance of different reasonable minds reaching different conclusions.' *I. C. R. R. Co. v. Anderson*, 184 Ill. 294. In such circumstances negligence is a question of law for the

court. Appellant was an adult of experience, accustomed to drive over city streets and must 'be presumed to have the capacity of making some effort to remove himself out of the way of the threatened peril.' *C. W. D. Ry. Co. v. Ryan,* 131 Ill. 474–479. He must be presumed also to have capacity of making some effort when he is in a place where danger from a car is liable to occur, to keep himself advised of its approach, especially when he has just seen a car coming upon the tracks he is about to cross.''

Plaintiff insists that ''it is a question of fact for the jury whether a pedestrian was in the exercise of ordinary care for his safety when crossing a street car track at a street intersection and upon the designated crosswalk where such person observes the street car approaching at a considerable distance, which slows down for the apparent purpose of receiving passengers who were standing at the proper place in the street intersection to board the street car and where such street car after having slackened its speed suddenly increases speed and proceeds across the intersection at the rate of 25 miles per hour, without ringing the gong or giving other warning and strikes the pedestrian.''

The difficulty with plaintiff's position in this regard is that there is no evidence in the record to support it. As already shown only two of the witnesses said that they saw Russell look east toward the westbound car. Both of these witnesses testified that the only time they saw him look east was when he was at the north curb and that at that time the street car either had just entered or was about to enter Peoria street, traveling at a speed of from 20 to 25 miles an hour. So that whether the speed of the street car was slackened half a block east of Peoria street, as two of the witnesses testified, 100 or 150 feet east of Peoria street, as one of the witnesses testified, or 25 or 30 feet east of Peoria street as still another witness testified,

said slackening occurred before Russell looked toward the street car. It is true that two passengers were waiting for a westbound car at the usual stopping place east of Peoria street, but there is no evidence in the record from which it could be reasonably inferred that decedent saw the street car slacken its speed in such a manner as to indicate that the motorman intended to stop the car to pick up the two men who were waiting to board it.

The following statement is found in plaintiff's brief: "The decedent was seen to walk in a southerly direction on the west side of Peoria Street to 59th Street, when the street car was approaching Peoria Street. As the decedent stepped down from the curbstone, into 59th Street, he was observed to walk in a southerly direction toward the street car track as the street car was slackening its speed, preparatory to stopping for the passengers." In support of this statement reference is made to evidence on pages 13, 19 and 27 of the abstract. On page 13 of the abstract is found the following testimony of Farrell as to when the slackening of the speed of the street car occurred: "The car was coming toward me at a fairly good rate of speed and just probably 25 to 30 feet before he hit the corner it seemed as though he did try to slacken up the speed a little but then he seemed to pick up speed right away again. I mean he tried to slack up the speed probably 20, 25 feet before he came up to the point where we were standing and then when he got just a little way from where it should stop he picked up speed again. I intended to take that street car. The street car was going just as fast when it passed me as it was when I saw it coming toward me. As he crossed over Peoria street he was going a good rate of speed. I did not see Russell, the fellow that got killed, before the accident." The only evidence concerning the slackening of the speed of the street car found on page 19 of the abstract is the testimony of Polakowski that such

slackening occurred half a block east of Peoria street. As to the testimony of Walsh on page 29 of the abstract concerning the slackening of the speed of the street car, we quote from pages 137 and 138 of the record: "Q. What did the street car do after it left Green Street? A. Well, it started to pick up speed and was going pretty fast. In about the middle of the block it slowed down a little. Q. Where was the street car when it slowed down now with reference to . . . east of Peoria Street? A. Well, I should say about— well, I just couldn't say how far it was from the corner. It was quite a ways. Q. How far did it go that way after it slackened speed? A. Not very far. Q. Then what did it do? A. Then it picked up speed. Q. When it was going across Peoria Street how fast was it going? A. Well, she started to go pretty fast again, didn't slow down much. . . . Q. Did you see the man when he got struck? A. I did. Q. Now, you saw him leave the curbstone, did you? A. Yes. Q. Tell us what you saw after that; he looked east you say and then what happened? A. Well, he looked east and the street car slowed up when he looked east and the next thing I knew when he went to cross the street the street car hit him. He tried to jump back."

The testimony of Farrell and Polakowski last above referred to lends no support to plaintiff's statement that Russell "was observed to walk in a southerly direction toward the street car track as the street car was slackening its speed preparatory to stopping for the passengers." Farrell fixes the point at which the street car slackened its speed at 25 to 30 feet from the corner or 20 or 25 feet east of where he was standing. He said the car "picked up" speed again "a little way" east of where he was standing, which was 10 or 11 feet east of Peoria street. It will be remembered that the street car was entering or about to enter Peoria street at a speed of from 20 to 25 miles an hour the only time Russell looked east, and that was

when he stepped from the curb. Polakowski places the street car half a block east of Peoria street when it slackened its speed. The only testimony of Walsh that could possibly be said to lend any support to the foregoing statement of plaintiff is his answer that Russell "looked east and the street car slowed up when he looked east and the next thing I knew when he went to cross the street the street car hit him." This answer made by Walsh must be considered in the light of his previous testimony that the street car slackened its speed half a block east of Peoria street and also in the light of the following questions and answers that immediately preceded such answer: "Q. Did you see the man when he got struck? A. I did. Q. Now, you saw him leave the curbstone, did you? A. Yes. Q. Tell us what you saw after that; he looked east you say and then what happened?" It was in response to this last question that the answer under consideration was made. This question concerned what the witness saw and what occurred after Russell had stepped from the curb. The front end of the street car had then already passed the men waiting for the car and had entered or was just about to enter the east side of Peoria street. The answer could not have been intended by the witness to have any application to the slackening of the speed of the street car before it had passed the men waiting for the car. In our opinion no inference favorable to plaintiff's theory may be drawn from this answer. There are no facts or circumstances in evidence that show that decedent saw any slackening of the speed of the street car before it passed the men waiting at the east side of Peoria street.

In the absence of proof of the special circumstances relied upon by plaintiff to excuse decedent's conduct, it was a want of due care as a matter of law for him, when he knew that a street car was approaching, to walk in front of such car when it was close enough to strike him before he was able to walk across the first

rail of the track. (*Emerson v. Richardson*, 296 Ill. App. 643; *Devine v. Chicago City Ry. Co.*, 203 Ill. App. 410; *Nelson v. Evanston Ry. Co.*, 261 Ill. App. 4.) We are impelled to hold that the deceased was guilty of contributory negligence as a matter of. law and that defendants' motion for a directed verdict should have been allowed. In the view we take of this case it is unnecessary to discuss the question as to whether defendants were guilty of the negligence charged. Since there are no facts in evidence in this cause which tend to show any excuse for plaintiff's want of care, it would serve no useful purpose to discuss the many cases cited dealing with special circumstances which were relied upon in those cases to excuse plaintiff's lack of care.

For the reasons stated herein the judgment of the circuit court is reversed and judgment is entered here notwithstanding the verdict in favor of defendants and against plaintiff.

*Judgment reversed and judgment here in favor of defendants and against plaintiff notwithstanding the verdict.*

FRIEND, P. J., and SCANLAN, J., concur.